## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARY SPIKES** | **CIVIL CASE NO.**_____ |
| **VS** | **JUDGE** _____ |
| **STATE OF LOUISIANA** and **LOUISIANA STATE UNIVERSITY** | **MAGISTRATE** _____ |
| | **JURY DEMAND** _____ |

### COMPLAINT

NOW INTO COURT, through undersigned counsel, comes plaintiff, Mary Spikes, a person of full age of majority and resident of the State of Louisiana, who submits the following:

1.

This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. 1331, as this matter arises under the laws of the United Stats, specifically Title VII of the Civil Rights Act, 42 U.S.C. 2000e et.seq.

2.

Made defendants herein are the State of Louisiana and Louisiana State University (LSU), a subdivision of the State of Louisiana.

3.

Plaintiff began her probationary employment with defendants on March 12, 2007, as Custodian 1. She was initially assigned to the Center for Engineering and Business Administration Building (CEBA).

4.

During the following month Mary Spikes was subjected to severe and pervasive acts of sexual harassment by Emanuel Harold, her supervisor.

5.

Mr. Harold stated to plaintiff that "You're fine, and I want to f--- you;" he kissed plaintiff on the cheek and patted her bottom on several occasions; he put his hand on her thigh and moved it up and down while giving her a ride home; he invited plaintiff in his office to watch pornographic material; he had her listen in on a telephone conversation wherein another woman was making sexual comments; he called plaintiff on her personal cellular phone and made offensive sexual comments to her; he offered to pay plaintiff in exchange for her stripping and shaking her bottom; and, he twice issued written reprimands to plaintiff claiming that "If you had tried some of this, you might not be going through this."

6.

Plaintiff first complained about Mr. Harold's behavior to Joseph Robertson, second line supervisor.  Mr. Robertson told plaintiff she should not file a complaint with management because it would be a waste of time.

7.

Further, Mr. Robertson related plaintiff's complaints to Mr. Harold himself, who then threatened plaintiff to have her fired.

8.

In July, 2007, plaintiff filed a sexual harassment complaint with Jennifer Doolos Normand of the Human Resources Department (HR).

9.

During HR's investigation, Emanuel Harold denied all allegations made by plaintiff.

10.

However, Candis Strickland, another LSU employee, corroborated some of plaintiff's version of events.

11.

Ms. Strickland recalled witnessing Mr. Harold stating to plaintiff "Take your jacket off for some money.  Get up on the table, shake your booty for $15.00, and do one of those dances. $35.00 for a lap dance, and I'll put the money on the table if you do it."

12.

Further, Ms. Strickland recounted her own experience with Mr. Harold, similar to that complained of by plaintiff.

13.

Specifically, Ms. Strickland stated that Mr. Harold called her into his office and handed her the phone stating that someone wanted to speak to her.  When she picked up the phone, Ms. Strickland heard another woman at the other end of the line stating "I want to lick you up and down."

14.

Ms. Strickland also reported Mr. Harold saying to her: "Come up to the third floor lounge and have a seat.  I will put it (his penis) out and show you."

15.

Mr. Robertson stated that plaintiff did complain to him about sexual harassment regarding her supervisor, and that he did report the complaints to Mr. Harold.  He also recalled telling plaintiff "You better be careful and know what you are doing before you go to Human Resources."

16.

At the end of the investigation, and due to him now continually harassing Ms. Strickland, HR found that Emanuel Harold had, indeed, engaged in sexual harassment and terminated his employment.  HR further instructed him to have no further contact with plaintiff or any of the employees he supervised.

17.

Due to her complaint, LSU began a pattern of retaliatory harassment that eventually led to plaintiff's termination.

18.

Despite the fact that plaintiff had been the victim, along with Ms. Strickland, LSU did not suspend Mr. Harold pending investigation, but transferred plaintiff instead, to work in the Life Science Building on or about July 16, 2007.

19.

While LSU may claim that it had plaintiff's interest at heart by transferring her from under Mr. Harold, the events that followed show the exact opposite: on August 2, 2007, only two weeks after her transfer, and after Mr. Harold's termination, Mary Spikes was informed by Dwayne Curtis, department night manager, that he was resigning and

that Emanuel Harold's girlfriend of several years would be plaintiff's supervisor at her new building (Life Science).

20.

Mr. Curtis informed plaintiff that he specifically told LSU the relationship between the new supervisor and Mr. Harold, and that it would not be a wise decision to place her over Ms. Spikes.

21.

LSU told Mr. Curtis that the decision to promote Mr. Harold's girlfriend to the Life Science Building was made prior to plaintiff's complaints of sexual harassment, and that the decision was going to be implemented regardless.  Joseph Thomas, acting night manager, confirmed the news to plaintiff.

22.

Thus, LSU transferred Mary Spikes to the Life Science Building fully knowing that she would end up being supervised by her harasser's girlfriend.

23.

On or about August 9, 2007, Mary Spikes attempted to contact Jennifer Doolos Normand of HR regarding the new development.  Ms. Normand did not return plaintiff's call.

24.

The following day, plaintiff contacted Michelle Brewer, employee relations coordinator with LSU's HR department, and related her conversations with Mr. Curtis and Mr. Thomas.  Ms. Spikes further expressed concerns about being supervised by Emanuel Harold's girlfriend.

5

25.

Ms. Brewer contacted plaintiff later that same day and informed her that she would be transferred to yet another building.

26.

On or about August 13, 2007, plaintiff met with Kim Garnier, department assistant director.  Plaintiff confronted Mr. Garnier with the fact that defendants had transferred her to that building knowing who the new supervisor would be.

27.

Mr. Garnier told plaintiff that her options were to be transferred to another building or to quit her job.  Faced with no other option, Mary Spikes chose another transfer.

28.

That same day, LSU transferred plaintiff to the Energy, Coast and Environment Building (ECE).

29.

Mary Spikes's problems did not end, wherein Karen Harris, a co-worker at the ECE building, engaged in a continuous pattern of harassment towards plaintiff.

30.

Immediately after Ms. Spikes was transferred, Karen Harris asked her if she had a sexual relationship with Emanuel Harold.  Plaintiff denied the allegation and stated that she did not want to discuss her sexual harassment complaint.  In response, Ms. Harris called plaintiff a "mother f---ing liar" and that she, plaintiff, "made all females look bad."

31.

Plaintiff complained about Ms. Harris's statements to her new supervisors, Mack Hogan and Doris Cotton.

32.

Mr. Hogan and Ms. Cotton asked plaintiff if she had any witnesses to the conversation.  When plaintiff stated "no," her two new supervisors stated that they could not do anything about it and that plaintiff needed to "toughen her skin."

33.

For the remaining month of August, 2007, Karen Harris kept spreading sexually offensive rumors about plaintiff, telling everyone present about Ms. Spikes's experience at the two previous buildings she worked at, and alleging that plaintiff was engaging in oral sex with Justin Johnson, one of the co-workers at the ECE building.

34.

Plaintiff again complained to Mr. Hogan and Ms. Cotton.  They again asked her if she had any witnesses.  Plaintiff replied that Justin Johnson was her witness.

35.

Mr. Hogan and Ms. Cotton then stated that Justin Johnson does not know what he's talking about and that he hardly understands English.

36.

Neither Mr. Hogan nor Ms. Cotton took any action against Karen Harris.

37.

On or about September 19, 2007, upon clocking into work, plaintiff told Ms. Cotton that she had a sore neck.  Several employees were present when she made the statement.  She then proceeded to her work area.

38.

On her way to her assigned area, plaintiff began hearing several employees making sexually charged jokes about her neck pain and stating that she "hit her head against the headboard."

39.

Karen Harris came to plaintiff's area and stated that plaintiff must have a "sore tail."  Ederick Simpson, with whom plaintiff was sharing the work area," added to Ms. Harris's statement by saying that "…the tail could take it, but the neck couldn't."  Then Mr. Simpson asked plaintiff why she did not use a pillow to block the headboard.

40.

During the first break that night all co-workers continued to make sexually offensive jokes about plaintiff.  Karen Harris stated "You know you gave that pussy to Justin Johnson."

41.

Ms. Spikes again complained to Doris Cotton.  Ms. Cotton responded: "Mary, I told you to toughen your skin."

42.

Ms. Cotton further told plaintiff she should report the new harassment to Mr. Hogan, when he returned to work the following week.  Mary Spikes did so as advised.

43.

Mr. Hogan's response to plaintiff's new complaint was to hold a meeting with all employees in the department wherein he explained what sexual harassment meant. Only that, instead of reprimanding the harassers, Mr. Hogan's demeanor was calculated to belittle and humiliate plaintiff.

44.

During that meeting, and in an overly sarcastic tone, Mr. Harold told all employees, while looking directly at plaintiff, that "Ya'll know some people in this building are sensitive." Some employees began giggling at Mr. Hogan's remark.

45.

On or about December 6, 2007, Karen Harris approached plaintiff and asked her if she liked Sherman Williams, a new employee. Plaintiff replied that she did, as a co-worker only. Karen Harris then told plaintiff: "You know you want to be his woman."

46.

Mary Spikes again complained to Doris Cotton. Ms. Cotton then informed plaintiff that Mr. Hogan had transferred out the day before, and that she, Ms. Cotton, was in charge now.

47.

Ms. Cotton further told plaintiff that she "...was not going to baby her like Mr. Hogan did" and that plaintiff needed to "toughen her skin."

48.

During the following days Ms. Cotton wrote plaintiff, and other co-workers, up for missing several days from work.

49.

Plaintiff refused to sign the reprimands and reminded Ms. Cotton that the days she had been absent were because of the emotional distress and humiliation caused by the sexual harassment she was subjected to by Karen Harris and other employees.

50.

Doris Cotton then accused plaintiff of being a "trouble maker" and told her that she needed to "get over being retaliated against."

51.

On or about December 12, 2007, as she was clocking in, plaintiff overheard Karen Harris tell Doris Cotton: "You know we got rats in this building."  Ms. Cotton replied: "Girl, I don't care what they have been through at LSU, I'll still write their asses up."

52.

Later that day, as plaintiff was cleaning the elevator, Karen Harris told her: "What are you doing coming from upstairs?  You must be making out with Justin Johnson."

53.

Mary Spikes again complained to Doris Cotton.  Ms. Cotton responded that she was "fed up" and that she would write up both plaintiff and Karen Harris.

54.

Ms. Spikes objected to the write up, stating that Karen Harris was the harasser, not plaintiff, and that Ms. Harris should be the only one written-up.  Ms. Cotton continued playing video games on her office computer and began humming a song very loud.

55.

On or about December 13, 2007, Mary Spikes contacted Kim Garnier and complained about the harassment she was subjected to by Karen Harris.

56.

Later that day, Doris Cotton called plaintiff in a meeting with the new night manager, Earl Jackson.

57.

Plaintiff began recounting to Mr. Jackson all the harassment she had endured from Karen Harris.  Mr. Jackson quickly interrupted plaintiff, and had Ms. Cotton bring Ms. Harris into the meeting.

58.

After Ms. Cotton left, Mr. Jackson became very agitated and began humiliating plaintiff by stating: "Who are you supposed to be? Are you a star?"

59.

Plaintiff started explaining that all the harassment had began back at the Ceba building with Emanuel Harold.  She then began to cry uncontrollably.  Earl Johnson left the room.  Plaintiff was also asked to leave the room and wait outside.

60.

While waiting outside, Earl Johnson held a meeting with Doris Cotton and Karen Harris behind closed doors.  When plaintiff was finally called in to join the meeting, Earl Jackson stated that both plaintiff and Karen Harris had acted unprofessionally and that it all had to stop.

61.

Mary Spikes objected to Mr. Jackson's interpretation of events and stated that she was the victim, while Karen Harris had been continuously allowed to harass her.

62.

Earl Jackson then told plaintiff that if she did not let go of the incidents, he would write her up.

63.

Plaintiff replied that she is simply complaining about repeated sexual harassment that she had been subjected to. Earl Jackson then stated that they should take the matter to HR. Plaintiff agreed and the meeting ended.

64.

The following day, on December 14, 2007, plaintiff filed another complaint with HR, wherein she recounted to Ms. Brewer how she had been harassed by Karen Harris and Edrick Simpson, and belittled by Earl Jackson in retaliation for her sexual harassment complaints.

65.

On or about December 19, 2007, Ms. Brewer contacted plaintiff and stating that HR was issuing plaintiff a letter stating that they had interviewed Karen Harris and Edrick Simpson, and that all of them, including plaintiff, had shown lack of professionalism.

66.

Plaintiff then asked Ms. Brewer why the accused were the only ones questioned, and why HR had not contacted any other witnesses.  Ms. Spikes further stated that she did nothing wrong, and that she was the victim.

67.

Michelle Brewer then advised plaintiff to leave the situation up to "the Almighty Lord."

68.

On December 20, 2007, the department held a Christmas party during which Earl Jackson was up on a stage announcing, and taking pictures with, door prize winners.

69.

Each time the winner was a female, Earl Jackson would announce: "Don't touch, they may say sexual harassment!"  Other department supervisors adopted the line and began announcing it too.

70.

Plaintiff's co-workers were laughing out loud at Earl Jackson's statements while they were all staring at plaintiff.

71.

On or about January 7, 2007, Mary Spikes heard most of her co-workers discussing, and making indirect comments to her, about her complaint of sex harassment and retaliation to Human Resources.  Karen Harris stated: "Being a rat is only going to make her life miserable in the ECE Building."

72.

On or about January 14, 2007, Mary Spikes was again transferred, this time to the Chemical Buildings.   Her "new" supervisor was Mack Hogan, who had previously supervised her at the ECE building.

73.

Ms. Spikes was assigned to two of the Chemical Buildings, alone, with no night shift co-workers.

74.

Both building were outrageously filthy.

75.

Neither of the two buildings had a clock-in/-out device, which forced plaintiff to have to walk several blocks every time, alone, in the middle of the night, in order to be able to document her hours.  At the time, plaintiff had no means of transportation, and the department management was fully aware of that fact.

76.

Ms. Spikes asked Mack Hogan if she could use a machine to wax and buff the floors as they were extremely dirty.  Mr. Hogan replied that females were not allowed to use that equipment, and that he would do it himself along with Kenny Brown, the other supervisor.

77.

Mr. Hogan and Mr. Brown did, eventually, wax and buff one of the five floors assigned to plaintiff.

78.

Mary Spikes was forced to manually clean the other four floors.

79.

Ms. Spikes also told Mr. Hogan and Mr. Brown that she was frightened when working in the two buildings, as she was alone, at night, and she could hear loud noises coming from inside.  Both supervisors downplayed her concerns and took no action.

80.

On January 15, 2008, one day after being transferred, Mary Spikes received a letter from HR marked "confidential."  The envelope was unsealed.

81.

The letter was in reference to plaintiff complaint of sexual harassment and retaliation regarding Karen Harris, Edrick Simpson and Earl Jackson.   The letter contained false statements from the accused, incorrect dates, and was missing most of the incidents of harassment that plaintiff had complained about.

82.

The letter also stated that HR was unable to substantiate plaintiff's allegations due to "conflicting versions of events."

83.

The letter further accused Mary Spikes of having made inappropriate and unprofessional statements.

84.

On January 16, 2008, Mary Spikes called Michelle Brewer of HR to dispute her findings.   During that conversation Ms. Brewer became abusive and disrespectful to plaintiff.

85.

For the following days Ms. Spikes complained to all supervisors up her chain of command about working alone, at night, in the two buildings.  She even made a written request to Earl Jackson, the department manager, for a clock in device in the other building, so she would not have to walk alone, at 12:00 a.m., from one building to another.  The request was never responded to.

86.

On January 17, 2008, Mary Spikes mailed a certified latter to Michelle Brewer disputing the results of the HR "investigation" into her last complaint.  On February 1, 2008, HR acknowledged receipt of plaintiff's correspondence and informed her that no further action would be taken on her complaint.

87.

On February 27, 2008, an all male floorcare team was assigned to wax and buff a room into one of plaintiff's buildings.  She asked one of the male employees if they could wax and buff one of the hallway floors.   Not only did the male employee refused plaintiff's request, but he responded by telling her: "You need a man in your life."

88.

Another male employee from the same team asked Ms. Spikes "Why did you do Emanuel Harold so bad?"  He then stated he had heard from Candis Strickland that Emanuel Harold had shown plaintiff and Ms. Strickland his penis.

89.

All the male employees there began laughing at plaintiff.

90.

Plaintiff complained to Mack Hogan about the continuous sexual harassment. Mr. Hogan began to giggle.

91.

Later that day, Mr. Hogan informed Mary Spikes that he had discussed her complaint with Earl Jackson who referred to plaintiff as a "trouble maker" and instructed Mr. Hogan to terminate plaintiff's employment before she fulfilled the one-year probationary period.

92.

On February 29, 2008, shortly after arriving to work, Ms. Spikes was taken to her department building where, Ms. Tara, a facility service personnel informed her that Earl Jackson had plaintiff terminated, allegedly for "failing to meet department expectations."

93.

Ms. Tara further advised plaintiff to sign a resignation letter instead of being fired.

94.

Mary Spikes took the termination letter and left.  Later that day she contacted Mack Hogan on his cell phone, as he was not at work.

95.

Mr. Hogan stated he did not know that Earl Jackson had plaintiff fired, but if he did, it was because she had filed a complaint against him in December of 2007.

96.

Mr. Hogan further stated that he had recently related to Mr. Jackson that plaintiff was a very good employee and that she was doing a great job at the Chemical Buildings.

97.

In fact, Mary Spikes had been honored as Employee of the Month for November, 2007, and received several merits for completing the six-month probationary period and for successfully completing all training she attended.

98.

Defendants subjected Mary Spikes to sex discrimination, severe and pervasive sexual harassment, hostile work environment due to her sex and retaliation for her protected activities.  Defendants' acts were in direct violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. 2000(e) et.seq.

99.

Plaintiff filed an appeal with the State Civil Service Department, which was denied.

100.

Plaintiff also filed a timely Charge of Discrimination with the Equal Employment

Opportunity Commission.  As more than 180 had passed since the filing of her charge,

the EEOC issued plaintiff her Right-to-Sue Notice on June 3, 2009.

101.

Due to the discrimination, harassment, hostile work environment and retaliation

caused by LSU and its employees, plaintiff, Mary Spikes, requests that, upon due process

be had, judgment be given for her and against the State of Louisiana and the Louisiana

State University, and the following awarded:

a.  Back pay and benefits;

b.  Reinstatement or front pay and benefits;

c.  Compensatory damages for emotional distress, mental anguish, humiliation and

embarrassment, invasion of privacy and defamation;

d.  Attorney's fees and costs;

e.  Any other award that the Court deems appropriate.

Plaintiff requests trial by jury.

Respectfully submitted,

*/s/ Dan M. Scheuermann*
Dan M. Scheuermann (La. #11767)
600 America St.
Baton Rouge, La. 70802
Telephone: (225) 344-9381
Facsimile: (225) 344-9384
E-mail: dan@dmsattorney.com
*Counsel for Plaintiff, Mary Gaidry*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARY SPIKES** | **CIVIL CASE NO.**_____ |
| **VS** | **JUDGE** _____ |
| **STATE OF LOUISIANA**<br>**and**<br>**LOUISIANA STATE UNIVERSITY** | **MAGISTRATE** _____<br><br>**JURY DEMAND** |

## VERIFICATION

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

    **BEFORE ME**, the undersigned authority, personally appeared:

### MARY SPIKES

who, being first duly sworn, deposed:

    That she is the petitioner in the above and foregoing Petition and that all the

allegations of fact made in the Petition are true to the best of her knowledge and belief.

_____
MARY SPIKES

*This done and passed*
*before me this* _8th_ *day*
*of* _August_ _____, *2009.*

_____
*Notary Public*
*Commissioned For Life*

20